The State Bank, Appellant, *v.* Ephraim Siff, Respondent.

First Department, January 10, 1930.

*Abraham Rickman* of counsel [*Max Silverstein* with him on the brief, attorney], for the appellant.

*George Z. Medalie* of counsel [*William B. Herlands* with him on the brief; *J. Leon Israel,* attorney], for the respondent.

MERRELL, J. The action was against the defendant as indorser of a promissory note. The defendant admitted the indorsement and non-payment, but alleged, by way of defense, facts showing that the consideration of the note was illegal. The note in question was one of a series given to plaintiff, as plaintiff contends, in consideration of the assignment of plaintiff's claim against Siff Brothers, a firm consisting of Max and Albert Siff, bankrupts. The facts, briefly, are as follows: Max Siff was the father of Albert Siff. They were engaged in the wholesale manufacture of clothing under the firm name of Siff Brothers. The firm became financially involved, owing creditors substantially $200,000. The heaviest of these creditors was the plaintiff, which the bankrupts owed about $88,000. The defendant is a brother of Max Siff and an uncle of Albert Siff. The Siffs, Max and Albert, individually, and the firm of Siff Brothers, were petitioned into involuntary bankruptcy by plaintiff. The evidence shows that prior to filing a petition in bankruptcy, with a view to tiding over their financial difficulties, the bankrupts obtained from the defendant herein an agreement to guarantee the plaintiff's claim up to $42,500, and that defendant actually signed such a guaranty agreement. Plaintiff, however, refused to accept the same

and subsequently petitioned the firm of Siff Brothers and the said Max Siff and Albert Siff, individually, into bankruptcy, and they were thereafter duly adjudged bankrupt. With a view to continuing their business the bankrupts offered to pay all of their creditors a composition of twenty per cent, ten per cent to be in cash and ten per cent represented by two promissory notes of five per cent each. In all there were 108 creditors of the bankrupt firm. Niney-two of the creditors agreed to accept the composition offered. In order to make the composition effective it was necessary for a majority of the creditors to acquiesce therein, and also that a majority of the amount of claims of the creditors should agree to such composition. Plaintiff, being a creditor to the amount of $88,000, or thereabouts, refused to accept the composition offer and filed objections thereto with the referee in bankruptcy. According to the testimony of Albert Siff, the president of the plaintiff refused to ratify the composition upon the ground that the plaintiff should receive a greater amount, having been offered already $42,500 on its claim. Albert Siff testified: " He said to me that he could not consent to take 20% because just prior to his filing the petition in bankruptcy against us he had had in his possession a guarantee from E. Siff [defendant] for half of any balance that might be owing them up to the total of $42,500 and that he would have to be put in the same position, in a position at least as good as that, before he would do anything to help us." Albert Siff stated that in reply to this he stated to the plaintiff's president that having been petitioned into bankruptcy it was too late to do that, and that such additional amount would be an illegal preference to the plaintiff. He further testified that plaintiff's president stated that unless the bankrupts would meet such demand made by plaintiff, they would tire them out and finally nobody would get anything, and that he wanted just what he would have gotten had the guaranty been carried out; that if the proposed composition was carried out, the plaintiff would receive approximately $17,500 out of the bankruptcy court, which would leave a balance of approximately $71,000 on its claim, and as it was a creditor for half, it would leave a balance of approximately $35,000 or a little over. Albert Siff testified that plaintiff's president stated that if defendant would guarantee notes, a sale of the plaintiff's claim might be made to some third party, and that finally it was suggested that the bankrupts give plaintiff five notes, only two of which, the fourth and fifth, would be indorsed by defendant herein, and the first three, maturing in one, two and three years, would not be indorsed by defendant, but made by the two bankrupts and not indorsed at all; that these notes would be one year apart, without interest, and be

for a little over $7,000 each, or one-fifth of the amount of $35,000 agreed upon as balance over what the plaintiff would have obtained through the composition; and that it was stated by plaintiff's president that the witness should see one Max Silverstein, attorney for plaintiff, and that Silverstein would be able to arrange matters " so that there will be no backfire, no reaction unfavorable to you." As a result of this conversation the witness testified that he visited Silverstein, who first told him to get a lawyer to represent him, and further testified that a scheme was evolved that plaintiff would assign its claim to the uncle of the bankrupt Albert, the defendant herein, and that eight notes would be executed, the first of which would represent the ten per cent cash of the plaintiff's claim; the next two notes would represent each five per cent of said claim; and the remaining five notes, made payable annually, would be given for approximately $7,100 each, the first three of which, however, were to be indorsed by the bankrupts alone, and the last two maturing in four and five years respectively, should be indorsed by the defendant herein. To accomplish this result, Albert Siff testifies that the attorney for plaintiff, Silverstein, suggested that the services of a dummy, who was financially irresponsible, be obtained, and that the transfer of plaintiff's claim be made to this dummy in consideration of the execution by the dummy of the eight notes, the first three of which, as before stated, were to be indorsed by defendant, the next three to be indorsed by the bankrupts, and the final two to be indorsed by the bankrupts and by defendant; and that the dummy would then reassign plaintiff's claim to the defendant herein, who, in turn, would indorse all of the notes, except the first, second and third of the last five. It is fair to state that this testimony of Albert Siff is denied by the witness Silverstein. The plan outlined seems to have been carried out. A negro boy, by the name of Bannister, who was a special elevator man in the Siff establishment, was selected as the dummy. He received $5 for acting as dummy. The transfer of the plaintiff's claim was made to him and he, in turn, assigned it to the defendant. Bannister executed the eight notes, five of which were in turn indorsed by defendant and turned over to the plaintiff. It was upon the seventh of these notes, or the one maturing four years from date, that the present action was brought. The evidence shows that $25,000 in cash for carrying out the composition was obtained by the defendant from the Bank of United States on defendant's credit. The defendant, having thus obtained the claim of plaintiff, withdrew the objections to the composition, and the same went through. The creditors of the bankrupts were duly paid the twenty per cent of their claims provided for in the composition agreement. As fast as the moneys

were turned over by the bankruptcy court to the defendant, who was the designee of the business of the bankrupts, he in turn paid amounts representing just twenty per cent to the plaintiff herein, so that the plaintiff received the amount it would have received had the bankruptcy composition been carried out, and in addition it held promissory notes, two of which were indorsed by defendant herein, and upon one of which two the present action is brought, and the other three, representing three-fifths of the balance of about $35,000, were indorsed by the bankrupts alone. Had the composition offer by the bankrupts gone through, the plaintiff would have realized but $17,500 on its claim of about $88,000. It not only received an amount equivalent to the twenty per cent which the other creditors received, but in addition it received forty per cent of its claim represented by the notes in question. Thus the plaintiff was accorded a total of sixty per cent of its claim, as against twenty per cent received by the other creditors. Under the guise of this sale of the plaintiff's claim to defendant, the plaintiff sought to circumvent the prohibition of the Bankruntcy Act against an unlawful preference to one creditor over another. We think the arrangement entered into between these parties was a mere subterfuge in order to accord to plaintiff a preference over the other creditors. The scheme appears to have been worked at a time when the other creditors were in entire ignorance thereof. Indeed, had the other creditors known that through this pretended sale of the plaintiff's claim to the defendant the net result would be that the plaintiff would receive sixty per cent of its claim as against the other creditors receiving twenty per cent, it goes without saying that they would not have acquiesced in the composition agreement. Without the knowledge of the other creditors an agreement was made that the plaintiff would assign its claim to the dummy negro elevator boy, Bannister, who in turn was to assign the claim to the defendant, a brother of one of the bankrupts and the uncle of the other. It was then arranged that the defendant, stepping into the shoes of the plaintiff herein as creditor, would then withdraw the objections which had been interposed to the composition offer, and that in consideration thereof the plaintiff bank would receive an amount equal to twenty per cent of its claim and in addition five notes of over $7,100 each maturing annually thereafter. Through this device plaintiff's objection to the composition was withdrawn and the composition was signed by defendant and finally confirmed. With a show of fairness and probably realizing the questionable character of its acts, the plaintiff went before the referee in bankruptcy and before District Judge Hough, and pretended to disclose the proposed arrangement, and it is claimed by plaintiff that two or three creditors

were present or were represented. It is very apparent that these pilgrimages before the referee in bankruptcy and before the district judge were for the purpose of lending an appearance of fairness and honesty to the transaction. That the real facts were not fully disclosed to the referee and to Judge Hough clearly appears from the evidence. Archibald Palmer, called as a witness in behalf of plaintiff, testified that he was a lawyer and represented the plaintiff in filing the petition in bankruptcy against the Siffs. He testified that he was present at the conference with Judge Hough and that Judge Hough was told of the particulars of the transaction and *that the additional consideration was not moving from the debtors,* and that Judge Hough then said that as long as it was not moving from the debtors, anybody could sell his claim, even though specifications were filed, and that the judge said that if the purchase was made, as Silverstein said, by a person other than the debtor, and no consideration was to move from the other debtors, then, so far as the creditors were concerned, the debtor or any one else on his behalf would have a perfect right to purchase the claim. It was not disclosed to Judge Hough that this purchase was made by an uncle of Albert and a brother of Max, and that, notwithstanding the testimony of Silverstein that the five notes were all to be indorsed by the individual bankrupts, the judge did not appreciate that over $21,000 of the consideration for the transfer moved directly from the bankrupts themselves, who were the sole indorsers of the three notes payable one, two and three years, respectively, from the date on which they were given. It goes without saying that had Judge Hough known that over $21,000 of the consideration for this transfer was upon the sole indorsement of the bankrupts themselves, he never would have acquiesced in or approved of the transaction.

The authorities are too numerous to require citation that any secret advantage given to a creditor to induce his consent to a composition is illegal and unenforcible. There is not the slightest doubt, upon the evidence, that the plaintiff withdrew its opposition to the composition and made its assignment with the understanding that it would not only receive the exact amount of the composition, which it did receive, but should also receive forty per cent of its claim represented by the five promissory notes for $7,100 each. It makes little difference whether the plaintiff signed the composition agreement or whether the result was accomplished through this roundabout way of a pretended sale of the plaintiff's claim. The secret preferential arrangement which was made, although the plaintiff was not directly a party thereto, was, nevertheless, illegal. In *Matter of Sawyer* (Fed. Cas. No. 12,395 [D. C. Mass., 1876]), Lowell, District Judge, said (at p. 560): " The man who was

undoubtedly bought *did not vote or sign any paper*, but simply withdrew an intended opposition. In the case of assent to or dissent from a bankrupt's discharge, it has been said by several eminent judges that a creditor has no moral right to oppose, unless for good cause; and so, if the opposition of a creditor is bought off, it must be assumed that there was good ground for opposition. *Brown* v. *Carr*, 7 Bing. 508, 516; *Hall* v. *Dyson*, 17 Q. B. 785; *Dexter* v. *Snow*, 12 Cush. 594, 595. It is not proved that the bankrupt took part in this fraud, and it does *not* stand on the footing of any other creditor being *actually* misled, *because this creditor signed nothing."* (Italics are the writer's.) No attempt was made upon the trial to show that the proposed arrangement whereby plaintiff was to receive sixty per cent of its claim was disclosed to the others of the ninety-two creditors who had signed the composition agreement. Silverstein, attorney for plaintiff, was asked: " Q. Did you notify any other creditors as to the terms of the sale to Ephraim Siff? A. I represented none. Q. You did not notify them? A. I did not notify anyone. Q. Nor their attorney? A. None at all."

Albert Siff, in his testimony, testified that he never heard of anybody knowing of the arrangement. It does not require much proof to show that none of the other creditors were aware of this secret plan which had been evolved, for if they had known of it, as described by one witness, it would have been suicidal to the composition of the claims against the bankrupts. In order to make such an agreement valid there should have been full and prompt disclosure to the other creditors who had acquiesced in the composition agreement which finally went through. As stated by Mr. Justice McAvoy in *Klaw* v. *Famous Players-Lasky Corp.* (207 App. Div. 211, 217): " The measure of propriety is disclosure, and not the comparative injury from non-disclosure. It is not necessary that the creditors' fund be diminished in order to invalidate the secret agreement." The Court of Appeals, by Crane, J., stated in *Meyer* v. *Price* (250 N. Y. 370, 376): " The illegality exists in the creditor undertaking to refrain from making some move in the bankruptcy proceedings or to withdraw from some action already taken which may impede or prevent the discharge of the bankrupt. *The law desires and encourages a full and free exposure and revelation of all the bankrupt's acts, conduct and property. Any agreement whereby a creditor undertakes to keep silent or inactive when his word or deed might assist the purposes of the bankruptcy proceedings is illegal."* (Italics are the writer's.)

At the close of the evidence the court held that the evidence disclosed a secret arrangement between the parties, and that the other creditors concerned were not notified of such agreement or

made aware of any of its terms or conditions. We think the evidence fully shows such to be the fact. The outstanding circumstance in this case clearly showed that through the device that was adopted the plaintiff obtained a preference as a consideration of the withdrawal of the objections which obstructed the composition, and that the arrangement entered into was not disclosed to the other creditors of the bankrupts. To get rid of the plaintiff's opposition to the composition the parties entered into the scheme which has been outlined. Plaintiff was fully aware of all these facts. The president of the plaintiff upon the witness stand was asked: " Q. You knew that Bannister was a dummy in the transaction and you knew that Ephraim Siff indorsed only two of the $7,100 notes? A. I did. Q. And as to the other three notes you knew that Max Siff and Albert Siff indorsed and Ephraim Siff did not? A. Correct. * * * Q. I will put it to you again — in addition to arranging for the payment that every other creditor was to get under the composition agreement according to the terms of the composition agreement, you also arranged that, in payment of this claim against the bankrupt that on three-fifths of those notes the only indorsement that would appear and the only signature that would appear outside of the dummy's would be the signatures of the bankrupts? A. Yes, sir. Q. So that in selling the claim to Ephraim Siff or to Bannister, three-fifths of the payment over the composition money was to be made only on the paper — the ultimate paper obligation of the bankrupts alone. A. Yes, sir." It thus appears that the major part of the consideration over the amount of the composition dividend moved not from the assignee of plaintiff's claim, but from the bankrupts themselves.

It further appears that in fact the defendant was not personally interested in the transaction, aside from his interest as a relative of the bankrupts. Unquestionably, he desired to aid them financially. The evidence is undisputed that he offered to guarantee plaintiff's account up to $42,500 before the bankruptcy proceedings were instituted; also, that he waived a personal claim to the amount of $5,000; and he borrowed $25,000 to carry out the composition agreement; and indorsed the two five per cent notes for all creditors. When it became necessary to buy off the plaintiff's opposition the defendant purchased the plaintiff's claim for the benefit of the bankrupts. Plaintiff's president understood the circumstances under which defendant was desiring to aid his relatives. He testified relative to a conversation which he had with defendant: " * * * he said he was a relative of the bankrupt who had an account with us and owed us money and that he wanted to try to set them up in business again and understood that we were

objecting to the settlements and that he would like to go to get the thing fixed up and he said that he would be willing to buy our claim * * *." He also testified that the defendant told him and he understood that what the defendant was doing was to help the bankrupts and for their ultimate benefit, and that he purchased the claim in order to help the bankrupts.

The evidence also showed that Silverstein, attorney for plaintiff, demanded $768.80 in payment of disbursements incurred by himself and by his client, the plaintiff, and that a check was given which was ultimately indorsed to Silverstein for that amount. It appears that a portion of this check went to pay Silverstein for his own services, and this, of itself, was an additional amount received by plaintiff in addition to that of the other creditors. The testimony clearly disclosed the methods of the parties. The fact that three-fifths of the preferential consideration given came from the bankrupts themselves, and absence of any financial interest on the part of the defendant, all goes to show that the transaction was not, in fact, a sale of the plaintiff's claim in good faith, but was simply an arrangement whereby plaintiff could receive a larger proportion of its claim than it would have received under the composition agreement consented to by the other creditors. We think there is no force in the claim of counsel for plaintiff urged upon this appeal that the evidence presented a question of fact upon the issue of secrecy which should have been submitted to the jury. Silverstein testified that he told the referee that the notes for the additional $35,000 were to be indorsed by the bankrupts *and by the defendant.* Palmer testified that the referee was told about the price that Ephraim Siff was going to pay for buying these particular claims. Having been informed that no part of the consideration moved from the bankrupts themselves, the referee and Judge HOUGH acquiesced in the proposed arrangement. They were led to believe that the debtors were not the ones who were giving preference out of their own funds, and that the sale was a *bona fide* one and free from objection. The testimony is conclusive that the real arrangement was not disclosed either to the referee or to the district judge, and that neither of them was informed that three-fifths of the additional consideration was to move from the bankrupts themselves, and that the defendant herein bought the claim for their benefit. None of these things were disclosed. Had they been, no referee or judge could have approved the transaction. The pretended disclosure to the referee and to the judge were gestures merely in an attempt to gloss over and make plausible a shady transaction. Nor is it of great importance whether or not disclosure was made to the referee or to the district judge.

*The disclosure should have been made to all the fellow-creditors who were interested in the composition,* and no evidence was given that there was any such disclosure. The proofs are directly to the contrary. We think the record presents no issue on the question of secrecy, but that the proofs overwhelmingly show almost without any contradiction that there was no disclosure whatever of the arrangement to the other creditors. The inference formed from the evidence is irresistible that there was no disclosure made to the other creditors. Had there been the composition agreement would surely have fallen. The court directed a verdict for defendant, and, we think, properly. All the facts point irresistibly to the sufficiency of the defense in this action. A verdict in plaintiff's favor must surely have been set aside as against the weight of the evidence. As was said by Judge ANDREWS in *Bulger* v. *Rosa* (119 N. Y. 459, 464): " The test of the right to direct a verdict is whether the court would be bound to set a verdict aside as against evidence, if rendered against the party in whose favor it was directed. If this would be the duty of the court, the judge need not await the verdict before acting, but in advance may rule the question as one of law. But as verdicts cannot be found on mere conjecture, neither will a shadow or possibility, nor a mere scintilla stand in the way of ruling the case in favor of the party who shows a substantial right, of which there is no substantial contradiction." The salient and undeniable fact in this case, that the plaintiff, through subterfuge and a pretended sale of its claim, has actually received, in addition to what was received by the other creditors consenting to the composition agreement, forty per cent of its claim, cannot be explained or denied. Such a preference was illegal, and the note in suit, given to carry out the same, was without consideration.

The judgment appealed from should be affirmed, with costs.

DOWLING, P. J., MARTIN and O'MALLEY, JJ., concur; PROSKAUER, J., dissents.

PROSKAUER, J. (dissenting). The plaintiff appeals from a judgment entered upon a verdict directed by the court in favor of the defendant.

The State Bank was a creditor of the firm of Siff Bros., against whom a petition in bankruptcy had been filed. Ninety-two of one hundred and eight creditors of the firm accepted an offer of composition of twenty per cent, of which ten per cent was to be in cash and ten per cent in two notes of five per cent each, payable in three and six months respectively. The State Bank, however, refused to accept the offer and filed objections to its confirmation.

Thereafter the State Bank sold its claim, through a dummy, to the defendant, a near relative of the bankrupts. The bank received therefor promissory notes made by the dummy and indorsed by the bankrupts and the defendant for an amount equivalent to what the bank would have received under the composition agreement. It also received five notes made by the dummy and indorsed by the bankrupts, two of which had the additional indorsement of the defendant. The claim was assigned to the dummy and on the same day the dummy assigned the claim to the defendant, Ephraim Siff. Both assignments were filed with the referee in bankruptcy and the objections to the composition were withdrawn by the ultimate assignee, the defendant herein. This action against the defendant is upon one of the promissory notes indorsed by him.

The verdict in his favor was directed upon the ground that the transaction was tainted with illegality. The learned trial court relied in reaching this conclusion upon the opinion of Mr. Justice McAvoy in *Klaw* v. *Famous Players-Lasky Corp.* (207 App. Div. 211). But there the creditor who received an advantage did not assign his claim; he continued to be a creditor of the bankrupt and by joining in the composition agreement with his fellow-creditors led them to suppose that all the creditors were upon a parity. McAvoy, J., there wrote: " The measure of propriety is disclosure, and not the comparative injury from non-disclosure." He rests his opinion fundamentally upon the authority of *Almon* v. *Hamilton* (100 N. Y. 527), where it was said: " The law exacts of all the parties to a composition the most scrupulous good faith."

In the present case, however, the State Bank was not a party to the composition. The filing of the assignments with the referee in bankruptcy was notice to all the other creditors that the State Bank had sold its claim to a relative of the bankrupts bearing their name. The other creditors were not misled by any concealment. Here there was an open recorded sale of the bank's claim. It may well be that if any creditor had objected to the voting of the assigned claim thus coming into the hands of the bankrupts and their relative, the referee in bankruptcy might have excluded the claim from being voted to coerce other creditors into a statutory composition. (*Matter of Weintrob*, 240 Fed. 532.) But no creditor took such position even after the filing of the assignments and the withdrawal of the objections by the assignee.

I see no consideration of public policy which should cause the court to condemn the transaction here under review. A recalcitrant creditor who objects to a composition in bankruptcy has a perfect right to sell his claim. The purchase of such claim by the

bankrupts or those associated with them may frequently be of great advantage to the creditors who wish to accept the composition. What the creditor may not do is secretly to take a larger proportion of the bankrupt estate than is distributed to his fellow-creditors; nor may he continue to pose as a creditor after he has ceased to be one and thus misled his fellow-creditors into the belief that he is sharing ratably with them; nor may he sign a composition agreement and secretly secure an advantage for himself. The State Bank here did none of these things. Fraud is the essential nature of the defense which attacks composition agreements on the ground that a creditor has received a special benefit. It rests upon the theory that the creditors are misled by the silence of the preferred creditor into the belief that all are being treated alike. There is no such factor in the present case.

As to the claim that a creditor may not receive a consideration for withdrawing objections to a composition, I find in a review of the bankruptcy authorities no case which goes to the length of holding that a creditor is forbidden to sell his claim merely because he has filed objections to a composition. The filing of the assignments, operating as a complete notice to the other creditors of the sale of the claim, furnished them with opportunity to safeguard their rights in any way they saw fit. They had a right under the Bankruptcy Act, if they so desired, to oppose the composition further and to adopt and prosecute the objections which had theretofore been filed by the State Bank. In point of fact, however, a very large majority of the creditors desired to accept the composition and apparently no one of them wished to prosecute the objections to the composition.

In my opinion to hold this transaction illegal would be to lay down a rule so strict as seriously to embarrass the administration of insolvent estates and make it almost impossible even for creditors in their own interest openly to purchase the claim of a creditor who was engaged in tactics of obstruction. Such a course is sometimes necessary in the interest of all concerned and is not essentially unlawful.

The circumstances relied upon by the respondent to give a sinister aspect to this transaction (under the authority of *Meyer* v. *Price*, 250 N. Y. 370) raise no bar to a recovery. That the plaintiff demanded more than the composition would yield to it, that it insisted that its counsel could legally carry through such an arrangement, that a dummy was used as a part of the mechanism of the agreement, are all facts which would be important if the plaintiff, while remaining a creditor, agreed not to oppose the bankrupt's discharge. In *Meyer* v. *Price* (250 N. Y. 370) CRANE,

J., writes: "All agreements, however, by a bankrupt to pay a creditor in full are not illegal. The illegality exists in the creditor undertaking to refrain from making some move in the bankruptcy proceedings or to withdraw from some action already taken which may impede or prevent the discharge of the bankrupt. The law desires and encourages a full and free exposure and revelation of all the bankrupt's acts, conduct and property. Any agreement whereby a creditor undertakes to keep silent or inactive when his word or deed might assist the purposes of the bankruptcy proceedings is illegal." There is implicit in this statement the assumption that the offending creditor remains a creditor. In my view the actuality of the open and recorded sale and assignment of the claim cannot be regarded as a mere form to cloak an illegal agreement to refrain from pressing the objections to the composition. The creditor has a right to sell his claim and the mere fact that he sells it puts it out of his power to press the objections to the composition. A different question would arise if the fact of sale had been concealed.

For these reasons the judgment appealed from should be reversed, with costs, and judgment directed for the plaintiff, with costs.

Judgment affirmed, with costs.